Good morning, Your Honor. John Ballas on behalf of Ted Kaczynski. I'm sharing my time with Chris Durbin, who represents Amakai. I'm going to handle the property issues and the First Amendment issues as it relates to Mr. Kaczynski's right to disseminate information. Mr. Durbin is going to handle the issue of the originals versus the copies, as well as the First Amendment rights of other individuals. The issues here – Do you wish to reserve any time for rebuttal? Because you've – the sheet says that you're taking 12 and he's taking 8. Yes, and I wish to reserve two minutes, and Mr. Durbin wishes to reserve one minute, if that's possible. So you've got 10 minutes. Thank you. The issues at the core here are relatively simple and straightforward, but they're very important not only to Mr. Kaczynski, but as well to a lot of similarly situated defendants in the sense that they have property that is seized by the government, but at the end of their criminal case, they may have a fine or restitution order, and what disposition of that property takes place. The general law, the basic principle, is clear, that when the government – when the case is over and the property is no longer used for evidence or possibly used for evidence, it's returned to the defendant unless the government has an overriding interest in it. In this case, the overriding interest that they've asserted is that they have a restitution lien that covers all of Mr. Kaczynski's property, either at this time or futurely required. That is not sufficient to override Mr. Kaczynski's interest in the property for the primary reason is because they are not using any of the property for – to obtain restitution in order to pay the victims. Under the government's proposal, the victims will obtain no money whatsoever from any of Mr. Kaczynski's property. And that is true under the case law as well as under the statute. Section 3613C, that talks about restitution liens, as well as the cases Mills, Lavin, and Duncan cited in the government's brief, all refer to using property, selling property that would be returned, money that would go to the victims. And all three of those cases cited by the government involved actual cash that the government seized, applied to the restitution order, and presumably the money was returned to the victims. Well, there was a plea agreement here, right? Yes. And the plea said something about not profiting from the crime, and this is a very important appellant here. So what is the relevance of that? The plea agreement, I believe, supports our position. The plea agreement states, there's a provision in it that states that if Mr. Kaczynski receives any money in terms of any interviews, writings, any artifacts, any memorabilia, that he is to return that money over to the government in order to satisfy the restitution order, presumably, again, to go to the victims. Correct me if I'm wrong. My understanding is that, and this may be a question that goes to your co-counsel or amici. Tell me if it is. My understanding is that Mr. Kaczynski has a copy of some or all of the materials that he wants back. Is that correct? It's true. Apparently, his contention is there are some of the pages that were badly copied or have been damaged or whatever. Yes. Let me just flush out the question, finish out the question, and that to the extent there's a gap between what he has and what the government has, the government is willing to make copies or allow copies to be made so that Mr. Kaczynski or his possessions, is that right? They've said that, yes. And is there any indication that they don't intend to do that if asked? No. But there's a big practical problem. There's two problems. One is the importance of the originals versus the copies. But second, there's approximately, we believe, about 7,000 to 8,000 pages of documents at issue, over 1,000 pages of his journals, and thousands of other pages of other writings, letters, correspondence to family and friends, as well as letters and correspondence from other families and friends. When this issue started getting rolling, Mr. Kaczynski asked his counsel, the Federal Defender's Office, for a copy of all the materials they had received from the government. These materials were given to him, given to an agent for him, in a large number already at the University of Michigan Special Collections Library. Mr. Kaczynski believes there's a large number that is still missing. There's a large number that are illegible or cut off in some way. It is impractical, impracticable in this situation for Mr. Kaczynski to compare the originals to the copies to determine if everything is there. Because he's not able, in his prison cell, to review that large quantity of documents. It's really impracticable for me. It's your office that has the stuff, right? Well, I'm now a solo private practitioner. The Federal Defender's Office has the stuff. Okay. The FPD has these copies, right? I spoke with a legal assistant at the Federal Defender's Office. They told me that when the case, when Mr. Kaczynski asked for it, they made the decision to give him what they had of these documents in terms of the stuff that was seized from his cabin. Why can't either you or the FPD or whoever his counsel happens to be assist him in the process of making his set of copies complete? We can do that, but it's going to take an extraordinarily amount of time to do that. A large number of documents are at the University of Michigan Library. They are understaffed. They said they don't really have the time and the situation to take that kind of task on their hand. It would be difficult for a court to find them. But they'd be happy to have the originals? They would like the originals. They don't have the staff to determine whether a set of copies is complete, but they do have the staff to collate the originals? Well, they have to. If they're given a complete set of the originals, they could put all the originals together and available for the public. But to compare their boxes of materials that they have now to a complete set, I mean, it would be very difficult, very time-consuming to do. It could take, you know, weeks. Counsel, I guess what I don't understand, and I must be missing something, what does anybody want to do with these materials? What do researchers, historians want to study them? The historians and researchers want to study them. So that, it seems to me, would be a good reason for keeping them where they are. Right now, they're in some, the original documents are in some FBI storage room. No one has access to them. The copies, some subset of the entire set, were given to Mr. Kaczynski, and some are at the University of Michigan Library. The copies? The copies. And what is the, what's the FBI, the government, as far as this record shows, what's the government going to do with the originals? Keep them in storage. Make them available to historians? Is there any record on that? The government has never stated that they would make the originals available to historians, researchers, et cetera. Okay. Do you want to? I do want to, at least maybe in a minute or two left before I say time for rebuttal, talk about the idea that Mr. Kaczynski, the government's idea and the district court's idea, somehow profits from having his property returned to him or his papers sent to the University of Michigan Library. I think the paramount value here of importance should be to get the highest value of restitution to the victims. Mr. Kaczynski does not profit in any monetary sense. He does not receive any money. If he did receive any money, it would have to be returned over to the victims to pay for restitution. The cases the government cite are really non-analogous because they involve situations where someone who, a killer, is trying to collect on life insurance policies or something, proceeds in that sense. So in that sense, they are directly profiting from the crime. But in this case, Mr. Kaczynski in no way does profit from the crime. And also the cases cited by the government, in fact, allow for the proceeds of crime if in any sense it could be considered proceeds of a crime to use their celebrity value rather than their pre-crime value. They are allowed to be applied towards restitution. Both in Lavin and Duncan, they did that. And I will save my remaining time. Thank you. Mr. Gerber. Good morning, Your Honors. May it please the Court, Chris Gerber and friend Miki Partes, the Freedom to Read Foundation, and the Society of American Archivists. Your Honors, I was going to start with the First Amendment contours of the public's right of interest, but given the panel's questions, I'd like to turn right away to the issue of the value of the originals and the value of the government turning over the originals to the University of Michigan Library. And this all ties in with the restitutionary interest that the government has asserted but essentially ignored over the last several years. And the question is really whether the record demonstrates an intent by the government to make these materials available and to preserve them in accordance with archival standards if they do simply retain the materials. I'd submit the record demonstrates no such intent. But your position is that they ought to be preserved. Indeed. Yeah. That they ought to be both. There's two goals here. One is preservation in accordance with archival standards. The second is full public access so that scholars and members of the public that are interested can study these original materials in a way that doesn't impinge on their rights to do so. Now, in addition to the inaction that the government has demonstrated over the last several years in not making any moves towards satisfying the restitutionary order in place here, you also have their arguments both below and on appeal that demonstrate that their motivation for their action is not related to the restitutionary interest but to a punitive interest, both a desire to prevent this undocumented psychic benefit to Mr. Kaczynski but also a simple distaste for Mr. Kaczynski's attempt to reach an audience. Below, for example, the government argued that Kaczynski simply wants to justify what he's done in social protest. They've argued that. See, that kind of interest can be satisfied by copies as well as originals. Well, the message of social protest, as far as the words on the page, could conceivably be satisfied by the simple words on the page of a photocopy. But the information to which the public has a right of access writ large is not simply just the words on the page. It's the contextual aspects and three-dimensional aspects of the documents, the paper used, the type of ink, the condition and age of the paper itself, bindings, loose leafs, all of these sorts of contextual and environmental clues that to the trained researcher and scholar provide insights into the environment and the age and the conditions under which these words were written. And given, you know, certainly what Mr. Kaczynski's done is reprehensible, but it's hard to deny that as a historical figure there's at least some historical interest here. And given that, the conditions in which he wrote much of his materials in this tiny one-room cabin in Montana, it's hard for anybody to say that over time the provenance of those documents will hold no interest for scholars and historians. And to the extent that there is a question about whether there will be a historical or scholarly interest in these original documents over time, the First Amendment would have that determination be made by the public and by scholars and by researchers rather than the government in this case. And accordingly, Amiki's concern here is that the stated restitutionary interest that the government has relied on is just a pretext for both a distaste for Kaczynski's attempt to reach an audience and an attempt to deny this psychic benefit that has no reasonable relation to the restitution order. Now, as to the public's First Amendment rights itself, of course, that's drawn from a number of straightforward First Amendment rights. And this Court and the Supreme Court have consistently recognized where government action impinges on the individual rights of litigants, there's nearly always a corresponding public right of access to that information that's correspondingly impinged. And in this case, while Mr. Ballas has ably argued in Mr. Kaczynski's First Amendment rights to publish and to express his ideas, the public's corresponding rights to access of that information is similarly impinged here. I guess as I go ahead. Well, as I as I listen to you, I can see why an original is more valuable. I'm not sure I can see why the First Amendment interest in an original is so much greater. The interest in the ink and the paper and things like that are usually directed at determining whether something is an original, because as an original, it has real value. And that's why we look at the ink and the paper and so on. That kind of value strikes me more as a property interest than it does a First Amendment interest. Your Honor, it depends on how you define the information to which the public has a right of access. Certainly in paintings, the original is there's a First Amendment value in an original, I imagine, other than a print. The question, though, is whether there's a significant distinction to be made between an original of, at least generically, whether there's a distinction to be made between an original of a piece of art and of a historic document. I mean, millions of Americans every year could go online and see a reasonable facsimile of the Declaration of Independence, but there's a reason why they travel to the National Archives to see the original. That's just a piece of paper. It's just a one. One of the originals. One of the originals. That's right, Your Honor. There are several originals. There are several. There's presidential libraries where original papers of presidents are housed as well. And while anybody could get a photocopy of it, there's a provenance and an aura of the original that adds value that constitutes information to which the public has a right of access. If the materials were ordered returned to Mr. Kaczynski, is there any limit on what he could do with them? In other words, could Mr. Kaczynski take them and simply hold on to them in his prison cell or in some storage facility? True. It seems that if Mr. Kaczynski were to receive the originals back to him, that would remove the element of state action that really implicates the First Amendment here. The reason why, Amik, you're interested in this case, though, primarily is that Mr. Kaczynski has evidence and intent to provide these original materials to the library where they'll be made available. Now, certainly, they will be Mr. Kaczynski's property. In the event that he takes them back, he would be able to do with them as he pleases. No binding enforceable restraint on their use? We would, as Amiki, we would certainly do our best to make sure and implore on him the importance of these, at least as regards the public's right to evaluate them for historical or scholarly input. But, again, the primary concern here is the government action of sitting on these in spite of strong interest in a restitution order. Okay. Thank you. You have three minutes left. Thank you, Your Honor. Good morning, Your Honors. May it please the Court. My name is Ana Maria Martel. I'm an assistant United States attorney. And I'm here representing the United States and the victims of Mr. Kaczynski's crimes. And as the Court has noted, there is no First Amendment issue here, Your Honors. The United States has consistently told, gave all of these documents to Mr. Kaczynski's defense counsel in the criminal case. When they point out to us that some of those documents are improperly copied or maybe some pages are missing, I have consistently told Mr. Ballas, come and copy anything you want. If Mr. Ballas or Mr. Kaczynski or the federal defenders or the University of Michigan want to come and copy them, they may come and copy them. So we are in no way trying, in fact, as counsel admitted, Mr. Kaczynski has already given many of those copies to the library. He has generated a lot of correspondence and writing since he has been incarcerated. And we have not, the United States has not in any way tried to limit his freedom of expression or the limit of our people's interests. Getting copies of these things. That's right. Well, I just am mystified about what you're doing, what you want to do with them. Your Honors, we have a restitution lien. This is not we're not just talking about documents here. Do you want to sell the stuff? I know there's stuff from the cabin. There's everything from the cabin. There's bomb-making materials. There's his used clothing. What the United States wants to do is what secured creditors do. We want to redeem. We basically want to sell them. And we want the proceeds to the. We want to sell the proceeds. And we want to do this in a commercially reasonable way of doing it. But you've told us repeatedly that these things have no value. Mr. Gosinski and his attorney have told us that they have no value. No, no, no, no, no. You, the United States government, has consistently taken the position in this litigation that these items have no value. We have taken the position that their extrinsic value is negligible. And that is what the Court found. In fact, in terms of a measurement of value, your theory is that they ought to be looked at pre-notoriety, right? Correct. Yes, Your Honor. But you want to sell them for notoriety value. No, we don't. Well, then what. No, no, no. Let me explain, Your Honors. And I think you will have less trouble than Mr. Ballast had with this. This is a. The court below is sitting as a court of equity. There is a very longstanding principle of American and English jurisprudence that criminals may not profit from their crimes. Mr. Kaczynski certainly understood this. And in his motion, in his Rule 41 motion, he said, if you pay my debt to someone else, you are giving me the money. We said, fine. This is his property. Let's look at his property as if this were John Doe's property. What is this property worth? If we sold it at a garage sale, we would get very little for this property. Okay? Mr. Kaczynski, because he's an infamous criminal, is not entitled to have this property sold with great fanfare as the memorabilia of the Unabomber. Well, then how are you going to draw down the. That's exactly the issue, Your Honor. As a secured. There is an answer to this. Article 9, Section 504 of the Uniform Commercial Code tells secured creditors how they may dispose of collateral in their possession. When there is an outstanding debt that is in default, and this is the situation that we have here. If I understand you correctly, what you want to do is have some sort of a sale, secured creditor sale. A private sale. And specify that it's worthless. No. We want to have a private sale, and we want to pay something. Initially, we were going to give him a credit, and then they were correct. They pointed out if all he gets is a credit, there's no benefit to his victims. So we will pay money, and this is how we're going to measure how much we will. You put it on eBay. I don't. No, no, no, no, Your Honor. What we're going to do is we're going to, the United States is going to figure out how much it would cost us to hold a garage sale. Somebody would have to be paid to hold this garage sale, to organize all these materials. We will figure out the time and cost to the United States. We will also figure out the time and cost to the United States of holding it as a sale under the Federal Debt Collection Procedure Act, and whichever amount is greater, we will pay to the clerk of the court for the benefit of Kaczynski's victims. Now, once the property is ours, there's all these allegations that we're going to do terrible things to us. There's nothing on the record to that effect. And if your court, if the court – I just didn't catch that. You're going to have this sale. You're going to figure out how much – What we're going to do – You're not going to actually have this sale. You're just going to figure out how much – We're going to do a private sale, Your Honor. Yeah. Article 9, Section 504 of the Uniform Commercial Code allows private sales if the value of the property is known. In this case, what we said to the magistrate judge and to the district court below is tell us how much the stuff is worth. Tell us how much it's worth, and we will pay that. You know how you tell how much a celebrity value item is worth? You sell it in an auction. You can't tell what it's worth without that. But you can't do that in a court of equity, Your Honors. He is a criminal. He doesn't get the money. The victims get the money. But, Your Honor, his debt is paid down. Let me quote to you what Mr. Kicinski himself said on that issue. Okay. If Your Honors would look at the supplemental excerpts on the record at page 103, Mr. Kicinski is discussing selling his property. Okay. He admitted that his property was of negligible value if it was not – if it did not have celebrity – a celebrity premium. And Kicinski quoted Black Law's dictionary that a party who has a debt paid for him is in the same position as though the money were paid to him directly. And if the United States were to sell this at a celebrity auction and pay down his debt, his restitution debt, the money would, in fact, be benefiting Kicinski directly. That means if you had confiscated four billion bars of gold from him, you couldn't sell it for the benefit of the victims because it would reduce his restitution debt. And, therefore, he would profit. Four billion bars of gold have intrinsic value. This stuff has intrinsic value. And he would profit when you sold them. That's the argument you just made. His – his – his – he would profit if he gets a celebrity premium. He does not profit any more than if – when he sold the land, the land in Montana, he valued in his CJA application at between $6,000 and $7,500. This makes absolutely no sense. He sold – he sold – Kicinski sold the land after his conviction. You are reducing his debt either way. Yeah. He is profiting by the way you define profit. Now, he's got such a huge restitution debt that he's never going to get out from under it. All you're doing is keeping victims from getting money. Counsel, let me ask a little differently. In what little spare time I have, I like to read about history and psychology. It would seem to me that this material has a great deal of value, not like gold bullion, but to historians and psychologists to see what was in that little cabin and what he wrote, how he wrote it, the scribbles, what's on it, all this. I don't understand why the government, since it has no – since you don't want to sell it at celebrity value and reduce his debt because you say that's a profit, why the government wishes to lock this away in a safe someplace and do nothing with it. Your Honor, if the United States has this property in its possession, we can control that it's not stolen, that it's not misused. That doesn't mean that scholars – I'm not necessarily saying that you can't keep it locked up in a safe someplace. I'm just saying why would you want to do that when there are people who may be able to contribute to the fund of human knowledge and understanding of desperate psychological problems by examining this stuff. But why is the Court assuming that if the United States keeps it, these scholars will not be able to examine it? Can I ask this question? What's the government's restitution plan and where would I go to find it? I'm sorry? What is the government's restitution plan and where would the Court go to find it? The restitution plan, Your Honor? Yes. But in terms of being written someplace? You've described what you want to do. Have you set down anywhere in writing or otherwise what the government's plan is? In other words, we plan to have a private sale in a month, five months, five years, 15 years. We're going to do it in this method, that method. Where is that plan? That plan is not in writing, Your Honor. Does it exist? It does. Where? In your head? In discussions in my office. And the reason we have not taken more concrete action is because Mr. Ballast asked us not to do anything while the issue was pending. Once the district court decided for us what the value of the property was, we were free then to proceed to execute on a restitution lien. We have not done so. We will follow the steps that creditors follow. We will let Mr. Kuczynski know how much we're paying for his property, and when we're purchasing it, we will then deliver a check to the clerk of the court, and the property will be turned over to the FBI. There is no ñ nothing ñ I know the court is troubled by this, but there is nothing on the record that shows that if it is turned over to the FBI and it becomes possession of the United States, it will be kept from scholars, Your Honor. I'm a little bit offended. In other words, what you're going to ñ instead of selling this so that some private buyer pays money in that can be used to restore to the victims, the government's going to buy this and just spend some taxpayers' money to give to the victims. I don't understand this. Your Honor, there is ñ the United States is very concerned about the equity in this matter. And equity says that he may not profit. He may ñ Victims don't get compensation. Your Honor, some of the victims do not want this stuff to be sold at celebrity value. Is that in the record? No, it's not, Your Honor. Were you asked during the proceedings before the magistrate judge or before the district court to provide a restitution plan? No, I was not. We were following very standard commercial practice. Right, like it's a used car. But unlike a used car, Your Honor, it will go to the FBI, and the FBI knows how to handle these materials. The case that they relied on below, the Black Hills case, which involved bones of dinosaurs, that dinosaur is on display today and available to scholars and to the public, and the court, the Eighth Circuit, found that it belonged to the United States. So there is an assumption here that we're going to do something terrible, and I don't think there's anything on the record that justifies that assumption. Thank you, Your Honor. There's nothing on the record to suggest what you are going to do. Because that was not part ñ The answer to that question is yes. That's correct, Your Honor, because that was not part of the Rule 41 motion. Okay. Thank you. Thank you. Just a couple of very brief points, Your Honors. What is on the record as far as the government's intention? All we have are their arguments below and on appeal, that they don't like the idea of Kaczynski justifying his crimes as social protests, that they don't like the idea of his, quote, message of hate and violence seen in the light of day, and that they don't think, based on extra-record speculation, that the victims want these things published. Well, in a prior appeal in this case, it may be instructed that this Court said that releasing a psychological profile of Kaczynski to the public would aid the interests of justice by informing the public about Kaczynski's motivations for these crimes. It would seem that original source materials of Kaczynski's conceived of and executed at the time that he was committing these crimes would at least hold a modicum of similar appeal for the public. Secondly, as to the restitutionary value, the government has consistently argued that the papers themselves, at least, are valueless and that they're concerned with the sensationalism that they think might attend a public auction of these for, quote, unquote, celebrity value. If those are really the two concerns here, it would seem that the donation of these materials to a scholarly facility like the University of Michigan would work no harm to a restitutionary interest that they state can't be satisfied by these papers and would avoid the sensationalism that would attend a public trial. And finally, the restitution statute here was passed and noted in the Mills case that, first of all, the restitutionary interest should work no constitutional harm, and, second, that the materials ought to be kept only if needed to justify the restitutionary interest. They've not shown that's the case, sir. Thank you, Your Honor. Ms. Waller, very briefly. Two brief points. First of all, this is the first time today after numerous briefs before the magistrate judge and the district court that the government has ever said they have any restitution plan, any intention to actually give money to the victims. With respect to that plan, they should the accepted regular practice is to follow the procedures for enforcing tax liens, as the magistrate judge suggested in his order, which is to make the property available to the highest bidder either at auction or sealed bids, which would provide the most amount of money to the victims for restitution, if that's the real interest. The statute specifically says that if there's – if the property is not – have enough value to be more – to receive more than the cost of the auction and the procedure, that you can't even levy on the property or the property's return to the person. And just finally, Mr. Kaczynski, over a number of years, has continually expressed his intention to get these papers out. So I don't think there's a real concern that if the court does order all this property returned to him, even though I think he has a right to do with it as he wants, that he will do anything other than present it to either the University of Michigan Library or some other appropriate library or university. Okay. Thank you, Counsel. The case just argued is submitted. That concludes the Court's calendar for this morning, and the Court stands adjourned. All rise. The Court is adjourned.
judges: Schroeder, Canby, Hawkins